# Cunningham's Appeal.

1. The Act of May 1st, 1876, P. L., 60, provides *inter alia* in § 27 that "any existing fire or fire and marine insurance company . . . . . may at any time increase the amount of its capital stock. . . . . Increase of capital stock as aforesaid may be made by increasing the number of the shares of stock or by increasing the par value of the same and such

increased shares or increased par value *shall be allotted pro rata to the stockholders of said company according to their interest* and may be paid in whole or in part out of the accumulated reserve of the company in case the creditors of the company warrant such allotments, or the same may be disposed of as is provided in this Act (§ 4) for the organization of stock companies." Under this Act an insurance company upon Nov. 15th, 1880, increased its capital stock by allotting to each stockholder an option to subscribe for one share for each two shares then held, the par value of the shares being $10; with the proviso however that the stockholders availing themselves of this option should also subscribe "an agreement to pay $10 per share for the stock and also $10 per share for the privilege of subscribing, the proceeds of which privilege shall be added to the surplus fund of the company." A stockholder protested against this resolution and filed a bill to restrain the company from refusing to allow him to receive his allotment at par without paying the bonus.

*Held*, that the action of the company was unauthorized by the Act of Assembly quoted, and that complainant was entitled to the relief prayed for.

2. Increase of the capital stock of an insurance company must be either by pro rata allotment at par to its stockholders or by independent and voluntary subscription as in the formation of a new company. The stockholders cannot be charged a bonus on the stock to which they are given the right to subscribe.

3. The Act of June 29th, 1881, (P. L., 121) supplementary to the above mentioned Act of May 1st, 1876, P. L., 60 provided that "the stockholders may require the payment of any sum they may see fit for the right to subscribe for the increased stock to be issued." § 2 of the Act validated such action already taken by any company.

*Held*, that this Act was merely prospective and did not authorize or affect the action taken by the company in the case where the resolution of the stockholders was passed Nov. 15th, 1880, and the complainant's bill was filed on January 25th, 1881.

January 29th, 1885.    Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN, and CLARK JJ.

APPEAL from the Court of Common Pleas No. 1, of *Philadelphia county*:   Of July Term, 1884, No. 100.

Appeal of William T. Cunningham, Graham P. Cunningham and Winthrop R. Cunningham co-partners trading as Winthrop Cunningham & Sons; the same parties individually, and Joseph I. Keefe, from the decree of the Court of Common Pleas No. 1 of Philadelphia County dismissing a bill in equity filed by said appellants against the President and Directors of the Insurance Company of North America. The bill was filed in behalf of the complainants and of all other stockholders of the defendant corporation who in like right might intervene.

Upon the filing of answer and replication the cause was referred to William Rotch Wister, Esq., as Examiner and Master, who, after taking the testimony therein, reported the facts to be substantially as follows:—

The Insurance Company of North America was incorpora-

ted by an Act of Assembly of April 14th, 1794 as a Fire, Marine and Life Insurance Company. The Act of incorporation limited its continuance to Jan. 1st, 1815, but its charter was extended by successive enactments, and by supplement of October 1839 was made perpetual. By virtue of the Acts of April 6th, 1842, May 8th, 1850 and March 14th, 1871, the capital stock was increased to $1,000,000, of 100,000 shares at the par value of $10 each. The company then had no further power to increase its capital stock or the par value of the shares. On July 10th, 1876 a meeting of the stockholders was held at which the provisions of § 27 of the Act of May 1st, 1876, P. L. 60, were accepted and became a part of the charter, the company thereby becoming subject to the constitution of 1874. This section 27 of the Act of May 1st, 1876, is as follows:—

Sec. 27. Any existing fire or fire and marine insurance company, and any stock company formed under this Act, may at any time increase the amount of its capital stock if authorized so to do by the stockholders holding the larger amount in value of the stock at a meeting specially called for that purpose, of which at least sixty days' previous public notice shall have been given. At such meeting of the stockholders, and at all other meetings thereof, each stockholder shall be entitled to cast either in person or by proxy, subject to such regulations as to voting by proxy as the by-laws of the company may prescribe, one vote for each share of stock that shall have stood in his or her name on the books of the company for at least three months previous thereto. Increase of capital stock as aforesaid may be made by increasing the number of the shares of stock or by increasing the par value of the same, and such increased shares or increased par value shall be allotted pro rata to the stockholders of said company according to their interest, and may be paid in whole or in part out of the accumulated reserve of the company in case the condition of the company warrants such allotments, or the same may be disposed of as is provided in this Act for the organization of stock companies.

(Which is provided for in section 4.)

In September 1880, the directors having determined to increase their capital stock under this section, advertised for 60 days the notice of a stockholders' meeting to be held on November 15th, 1880, to consider a proposition "to increase the capital stock and surplus fund of the company by the issue of 100,000 additional shares to be paid for by the stockholders at $20 per share, $1,000,000 of proceeds to be placed to capital stock, and $1,000,000 to be added to the present surplus of the company." At this meeting the following resolu

tion was adopted by a majority in amount of value of the stockholders as required by the Act:—

"*Resolved*, That the capital stock of this company be increased $1,000,000, by the issue of one hundred thousand shares at par to the stockholders, in proportion of one share for each two shares held by them on the day they shall respectively subscribe for the same—they subscribing an agreement to pay $10 per share for the stock and also $10 per share for the privilege of subscribing, the proceeds of which privilege shall be added to the surplus fund of the company. Subscriptions will be received until, or on, the first day of February, 1881, at which time the right to subscribe shall cease, but no subscription will be received unless $2 per share is paid at the time of subscribing; the balance of the subscription, $8 per share will be payable, etc. . . . . . Certificates will not be issued for these shares until after the fourteenth day of January, 1882.

"At the time of subscribing, scrip receipts will be given transferable as stock is transferred on the books of the company to purchasers, and these must be surrendered when certificates are issued.

"Interest at the rate of four per cent. per annum will be allowed on all payments from the date of receipt, and paid on the next ensuing dividend day, to the registered holder of the scrip receipt, until the certificates are issuable.

"All shares not subscribed for on or before the first day of February, 1881, and those the price of which is not fully paid by the fifteenth day of December, 1881, will then be sold at public auction in this city, on thirty days' notice in the papers, for the benefit of the company, but at not less than $20 per share. . . . . ."

The complainants protested against this resolution and demanded the right to subscribe at $10 per share without paying the bonus of $10 per share additional but were refused the right so to do and were informed by the officers of the company that their allotments of the increase of stock would be sold according to the above resolution, "if not subscribed for by them at $20 per share on or before February 1st, 1881." The plaintiffs waited until the annual meeting January 11th, 1881 when they proposed a resolution to correct the action of November 15th, 1880 which resolution was ruled not to be in order and that ruling was sustained by the meeting. They then filed this bill praying,—

1 and 2. For an injunction enjoining the increase as proposed or restraining the demand for $10 per share bonus.

3. A decree that complainants shall receive their shares upon payment of $10 per share.

4. An injunction against selling the allotments to which complainants claimed to be entitled, and 5 further relief.

A special injunction was granted as prayed for, but on the same day, Jan. 25th, 1881, the court varied the order granting the injunction "so as to confine it to prohibiting the company dealing with the rights of the complainants or any of them, or of otherwise interfering with those rights until the further order of this court, and also prohibiting the defendants from taking any action which will deprive the plaintiffs of the right to subscribe pending this suit, either before or after February 1st, under protest, until the further order of this court."

It was further proved that on November 15th, 1880, the number of shares outstanding was 200,000, and that prior to January 26th, 1881, 22,456½ options had been sold, of which the company was notified, and that these purchasers paid the company on or before that date $674,245; that in July, 1880, the market value of the assets was $6,437,325.82, and on January 1st, 1881, $7,300,936.26, making the value of assets to each share for the purpose of distribution or winding up, on July 1st, 1880, $20.60, and on January 1st, 1881, $22.27, counting nothing for the value of the business or good will.

The Master, after finding the above facts, recommended a decree dismissing the bill with costs, in a lengthy opinion, the more important portion of which was as follows: The twenty-seventh section of the Act of May 1st, 1876, provides that increased shares shall be allotted to the stockholders *pro rata*, and "may be paid in whole or in part out of the accumulated reserve of the company," and plainly intends the payment of the then par value of the shares. The phrase that they "may be paid in whole or in part out of" the accumulated reserve, means that the full par value is to be paid for.

For these reasons I am of opinion that no new shares can be created, until at least the par value thereof is paid, and I do not agree with the defendant's counsel that no sum has been fixed that must be paid by the new shareholders.

Can the company create new shares at a price above par?

No express power to do so is given by the twenty-seventh section of the Act of 1876, where the power to increase is found, nor by any general law. It is strenuously contended by the plaintiff's counsel that without such express power it cannot be done. They rely upon the seventh section of Article 16 of the Constitution of 1874, which provides that "no corporation shall issue stocks or bonds, except for money, labor done, or money or property actually received; and all fictitious increase of stock or indebtedness shall be void." The stock, etc., not to be increased, except in pursuance of general

law, nor without the consent of the persons holding the larger amount in value of stock duly obtained.

There is no pretence that the stock is to be issued, except for money actually paid; no pretence that it is fictitious stock. It is proposed to be issued in pursuance of general law, and with the consent of the persons holding the larger amount in value of the shares. It is, therefore, plain that these inhibitions of the Constitution do not apply. . . . .

It was further argued for the plaintiffs, that the terms of the resolution of the 15th of November, 1880, were in violation of the statutory right of the plaintiffs to have an allotment to them of their *pro rata* of the increased number of shares; but they seemed to have overlooked the fact that there is no statutory right to them to subscribe to increased shares except in pursuance of a resolution of the stockholders to increase. No right to issue new shares exists independent of the will of the majority of the shareholders, and in this case that will is conditioned on the payment of $10 a share to the company for the privilege. It follows logically that, if this payment is illegal, there is no authority whatever for any increase, and the plaintiffs have no right to any allotment of shares. . . . .

In York *v.* North Midland R. W. Co., 16 Beavan, 485, Hudson, the so-called railway king, sold shares of a company at a premium, which he proposed to keep and return the par value of the shares only to the company. He was not permitted to do so, but held liable for the premium he had received and interest upon it. It is difficult to suppose that his able counsel, Sir Fitzroy Kelly and three others, in a hotly contested case, could have overlooked the fact that the effect of the plaintiff's demand upon Hudson was to enable the company interested to obtain more than par for the shares, and that they would not have strenuously objected to any mode of making their client pay that had the slightest suspicion of illegality. . . . .

There was on the part of the complainants an actual and perfect acquiescence in the terms of the resolutions for fifty-two days so far as the public and their fellow shareholders were advised, during which time many thousand shares had been subscribed for and many thousand options sold. Then there was an ineffectual appeal to the body of the stockholders to repeal the resolution; then a further quiescent period of fourteen days; then this bill in equity, and finally partial compliance with the resolution up to the 1st of August, 1881, more than six months longer.

The plaintiffs, if entitled to equitable relief at any time, were bound to act promptly, so as to prevent the issue of the illegal shares, if they were illegal, and thus prevent inextricable confusion and expensive and almost interminable liti-

gation to the defendant company and to their fellow share-holders.

It was said in Terry *v.* Eagle Lock Co., 47 Conn., 141: "Especially is this so where the petitioner has stood by and allowed the illegal transaction to be consummated, and has induced or allowed others to become interested in the corporation in the belief that the existing state of things was legal."

These remarks are precisely applicable to these plaintiffs, who stood by and permitted thousands of dollars to be invested in a scheme they say was illegal and *ultra vires.*

The same view was taken in Kent *v.* Quicksilver Mining Co., 12 Hun, 53, and Hoyt *v.* Quicksilver Mining Co., 17 Hun, 169, where the question was, whether preferred shares of a company could be issued, there being no express power to issue such.

The cases were taken to the Court of Appeals, New York, and are discussed in Green's Brice, pages 154, note *a*, 551, note *a*. Judge FOLGER discusses the question fully and satisfactorily. He says:—

"When the public is concerned to restrain a corporation within the limit of the power given to it by its charter, an assent of the stockholders . . . . . will be of no avail. When it is a question of the right of a stockholder to restrain the corporate body within its express or incidental powers, the stockholder may in many cases be denied, on the ground of his express assent or his intelligent though tacit consent to the corporate action." A corporation may do acts that do not affect the public, but only the interest of the stockholders without power to do them, which "may be made good by the assent of the stockholders, so that strangers to the stockholders, dealing in good faith with the corporation, will be protected in a reliance upon those acts."

In that case Judge FOLGER held a delay of four years "such tacit acquiescence and delay" as to amount to indefensible laches and estoppel.

The mode of issuing new shares, and the requirement of more than par, was a matter of administration. It was not contrary to law as regards the general public; it was not against the policy of the state, as is shown in the power given to such corporations to increase their capital to an indefinite extent and by the Act of June 29th, 1881, P. L., 121 which expressly gives insurance companies the right to increase their stock in the mode proposed by the defendant corporation.

Exceptions filed by complainants to this report were dismissed by the court, who filed no opinion, and entered a decree dismissing the bill and dividing the costs between the parties.

Thereupon the complainants took this appeal, assigning for error the action of the court in overruling their several exceptions to the Master's report, and dismissing the plaintiff's bill, and charging them with one-half the costs.

*J. Warren Coulston* and *George M. Dallas* (with whom was *George L. Crawford*), for appellants:—The only statutory authorization for any increase of stock of the defendant company is found in § 27 of Act of May 1st, 1876, P. L., 60, and this provides that the increase of stock must be allotted *pro rata* to the stockholders in proportion to their respective interests. But the terms of this allotment, according to the resolution of the company annexed as a *condition* that the stockholders must pay $10 per share for what is granted to them by law as a *right*, not a mere *privilege*. The excess of $10 per share is not to be added to the capital stock, for which it is really required to be paid, but to the "surplus fund," which cannot be thus forcibly increased. It is clear that the power to increase stock can only be exercised in strict conformity with the terms of the Act of Assembly granting the power. Turnpike *v.* Myers, 6 S. and R., 12; Moffatt *v.* Farquhar, L. R. 7, Ch. Div., 591 (604-5); Hawes *v.* Oakland, 104 U. S. S. C., 450 (460); Perrine *v.* The Canal Company, 9 How., 172; Commonwealth *v.* R. R. Co., 3 C., 351; Packer *v.* R. R. Co., 7 H., 218; Com. *v.* Pass. Railway Co., 2 P. F. S., 516; Stewart's App., 6 P. F. S., 413; Bank *v.* Com., 7 H., 144; Fowler *v.* Scully, 22 P. F. S., 456.

There was no laches on the part of the complainants. The resolution was passed November 15th, 1880; our bill was filed January 25th, 1881. It is not the duty of an injured party to rush hastily into litigation, but first to make every reasonable effort to avoid it. In this case the complainants waited until the next annual meeting January 11th, 1881, and upon their failure there to obtain satisfaction filed their bill in fourteen days. In this they fulfilled their precise duty: Hawes *v.* Oakland, 104 U. S., 460. If other persons did, as the Master has said, invest in this scheme, which was illegal and *ultra vires*, it was done upon the faith of nothing which the appellants said or did, and they were chargeable with no duty which required them to institute proceedings to test the question for the information of others. Knowledge of the law is to be imputed to those who so invested, as well as to these appellants: R. R. Co. *v.* Stichter, 21 Am. Law Reg., N. S., 720; McCalmont *v.* R. R. Co., 10 W. N. C., 338.

*R. C. McMurtrie* and *George W. Biddle*, for appellees.—No more than an *optional* right to take the shares when allotted

was or could possibly be given. It was surely not compulsory. If, then, any one holder declined taking his quota, on the plaintiffs' contention the whole scheme must drop. They read the provision as an alternative condition of the exercise of a franchise. The stock must be allotted or disposed of as required in the clauses relative to the organization of a company; that is, by subscribing. They contend that these cannot be combined so as to provide for the disposition of such shares as are not accepted by allottees.

Plaintiffs' contention goes to the length that the provision in section 5, authorizing an organization by subscribers, prohibits a stipulation by the promoters that anything more than the par shall be paid. That it would be illegal for men to agree that they would organize a company with $100,000 capital, on condition that all who invested should contribute twice the par of the shares. Granting it would be illegal to make the money paid beyond the par *capital*, is it illegal to agree that a fund shall be paid which becomes general assets of the corporation?

Our contention was, that if there had been no mode pointed out for disposing of the shares that constituted the increased capital, two conditions were imposed by implication. 1. The company must receive the par of the increase, because the transaction was a representation to the community that it had so much capital. 2. All shareholders must have an equal right to participate in the increase.

The plan proposed is clearly authorized by Reese v. Bank of Montgomery, 31 Pa. St., 78. It is contended that a condition is imposed upon the exercise of a vested right. But if the condition is illegal, the whole scheme falls, by analogy to the law in the case of powers: 2 Sugden on Powers, 184; or of assignments for benefit of creditors with illegal conditions annexed.

The issue of shares is an incidental power belonging to the defendants by virtue of their incorporation, and may be done in any way not prohibited; the statutory power is enabling, not disabling: Sutton's Hospital, 10 Rep., 30 b; Tiverton v. Loosemore, 9 Ap. Cases, 508; Phila. & W. C. R. R. Co. v. Hickman, 28 Pa. St., 518; Cumberland v. Baab, 9 Watts, 458; West Chester v. Jackson, 77 Pa. St., 321; Ardesco v. N. A. M. Co. 66 Pa. St., 375; McCarty v. Selinsgrove, 6 Norris, 336; Dana v. Bank U. S., 5 W. & S., 243. So long as the requirements of the statute for the security of the public are observed, the rest is a matter for internal arrangement by the stockholders, and there the will of the majority governs: Wallworth v. Holt, 4 M. & Cr., 665; the Quicksilver Cases, Green's Brice Ultra Vires, 165, 166, 552; Hazlehurst v. Savannah R. R. Co., 43 Ga., 53; Scovill v. Thayer, 15 Otto,

149; Columbia Bank *v.* Williamsport Gas Co., 41 Leg. Int., 498; Phila. & W. C. R. R. Co. *v.* Hickman, 28 Pa. St., 318; Cumberland *v.* Baab, 9 Watts, 458; Reese *v.* Bank of Montgomery, 31 Pa. St., 78; Curry *v.* Scott, 4 P. F. S., 270; Coleman *v.* Columbia, 51 Pa. St., 70; Jackson *v.* Turquand, 4 E. & I. Ap., 305; York *v.* Hudson, 16 Beav., 485.

There was laches on the part of complainants. Hawes *v.* Oakland does not apply where the corporation itself proposes to do the act complained of: Atwool *v.* Merryweather, L. R., 5 Eq., 464, note; Gregory *v.* Patchett, 33 Beav., 595; Duckett *v.* Gover, 7 Ch. Div., 82; Mason *v.* Harris, 11 Ch. Div., 97; Silberlight *v.* Silber, 12 Id., 717.

Mr. Justice GORDON delivered the opinion of the court, February 23d, 1885.

The learned counsel for the respondents, in the opening sentence of their counter statement, say: "It was never pretended that the company could, without legislative sanction, increase or diminish the number of shares or par value thereof." From this admission, which we readily indorse as correct, we pass at once to the twenty-seventh section of the Act of 1876, from which the stockholders of this corporation derived their power to issue the stock shares the subjects of the present controversy. The section referred to reads as follows: "Any existing Fire or Fire and Marine Insurance Company, and any stock company formed under this Act, may at any time increase the amount of its capital stock if authorized so to do by the stockholders holding the larger amount in value of the stock at a meeting specially called for that purpose, of which at least sixty days' public notice shall be given. . . . . Increase of stock as aforesaid may be made by increasing the number of the shares of stock or by increasing the par value of the same, and such increased shares or increased par value shall be allotted *pro rata* to the stockholders of said company, according to their interest, and may be paid in whole or in part out of the accumulated reserve of the company, in case the condition of the company warrants such allotments, or the same may be disposed of as is provided in this Act for the organization of stock companies." The first clause of the latter part of this section is that under which the stockholders acted in providing for the increase of the capital stock of the company which they represented, and the latter clause, which refers to section 4, needs no further notice as it does not enter into the present controversy. To this Act, then, and its interpretation, if any it needs, we are confined, for it contains the power under which the stockholders acted, and with it we have but to compare their reso-

lution in order to ascertain whether the condition appended to that resolution was, or was not, *ultra vires,* for it is utterly useless for us to attempt to be wise above what is plainly written in the statute, and to go wandering off among authorities which can have little or nothing to do with the case. That they had power to cause the stock to be issued is not denied, and that it was issued is a fact, so the only question left is, as we have already said, that respecting the lawfulness of the appended condition. Were the Act of 1881 operative in this contention there could be no debate about the lawfulness of the stockholders' action, but as we agree with the learned Master that it is not so operative, we dismiss it from the case. Now, in the outstart, this is to be emphasised: the condition is found, not in the Act but in the resolution adopted by the meeting of the 15th of November, 1880. We cite the resolution with its condition, as follows: "Resolved, that the capital stock of this company be increased $1,000,000, by the issue of one hundred thousand shares at par to stockholders, in proportion of one share for each two shares held by them on the day they shall respectively subscribe for the same, they subscribing an agreement to pay ten dollars per share for the stock, and also ten dollars per share for the privilege of subscribing, the proceeds of which privilege shall be added to the surplus fund of the company." Par in this connection evidently means one hundred per cent. premium. Passing, however, so curious an interpretation of the word "par," we ask by what authority did the majority of the corporate meeting impose such terms as these upon the minority? The Act is specific, "and such increased shares, or increased par value, shall be allotted *pro rata* to the stockholders of said company according to their interest." The resolution, on the contrary, provides that the stockholder shall not have such *pro rata* allotment unless he pays to the company a bonus of ten dollars on each share. But if ten dollars could be thus imposed, why not $20, $30, or $50? Under and by the Act the stockholder had an important privilege, but under the resolution he has none, or only such as the majority of the stockholders' meeting chose, *ex gratia,* to give him. The learned Master says: "But they," the plaintiffs, "seemed to have overlooked the fact that there is no statutory right to them to subscribe to increased shares, except in pursuance of a resolution of the stockholders to increase." But, on the other hand, the Master himself overlooks the fact that these stockholders could only act under the statute; that in it their powers were found, that by it their powers were limited, and that everything they did beyond it was to no purpose whatever, utterly vain and nugatory. They had no power to append a condition to the statute to suit their

own purposes, and to squeeze out of the corporation all those who either could not, or would not, pay to them their bonus. It is to no purpose to say that even after this shave on their stock they had still a bargain, for the sole question is, what was their right, and not what was, or might have been their profit? The answer to this inquiry may be easily had through the answer to the question, to what would they have been entitled had the resolution been passed in the terms of the Act and without the appended condition? Certainly, to the stock clear of the bonus. Again, suppose the resolution had been to double the value of the existing stock, instead of issuing new shares? Surely, then, a bonus could not have been compelled, and yet in the Act both means of increasing the capital of the company stand.on precisely the same footing, and the *pro rata* distribution of either is as much the right of the shareholder as is the ownership of his original stock. The Act of 1876 was designed not only to enable corporations to increase their business capital, but also to protect the individual stockholder; the resolution, however, under consideration, not only perverts the statutory idea of protection for the shareowner, but belies itself in doubling what it designates as capital. In this case, contrary to what is affirmed in the old saw, there seems to be a good deal in a name. By this artifice two millions of dollars are added to the working fund of the corporation, of which one million is said to be capital, and the other, though raised at the same time and by the same means, is called "surplus fund" earning of the association. Let those believe this who can or will, and let those who have agreed to the action of the majority of the stockholders abide by that action, but as for the appellants they cannot be so held. There has been an attempt to deprive them of their statutory rights through an unlawful exercise of an alleged corporate power; an attempt which, without doubt or dispute, a chancellor has the power to restrain, and to refuse an exercise of that power would, in the present case, be a denial of the appellants' right to have their cause heard and vindicated in a Court of Equity.

. The decree of the court below dismissing the plaintiffs' bill and imposing upon them the one half of the costs, is now reversed and set aside at the costs of the appellee; and it is ordered that the said appellee allot to the appellants such an amount of the new stock shares as shall be their proportion under the Act of the General Assembly above recited, free from bonus or charges, and if they, or any of them have, under protest, paid such bonus or charges for the said stock shares, that the same be refunded to them with interest. That the record be remitted to the court below for the purpose, if neces-

sary, of having an account stated between the parties, and for the full execution of this decree.

PAXSON J. filed the following dissenting opinion:—

I do not fully agree with the majority of the court in their construction of the Act of 1876. But, conceding their view of it to be correct, I would not sustain this bill for obvious reasons. They may be briefly stated as follows:—

1. The complainant has no equity. His object is to get stock at $10 per share, for which other shareholders have in good faith paid $20. This is not equity; it is iniquity.

2. He has a full and adequate remedy at law. For the refusal of the company to allot him his proportion of the stock at par, he may sue at law and recover full damages. He has therefore sustained no injury which the law will not redress in the amplest manner. The right to particular shares of stock, where other shares can be bought in the market, is not a right which equity will enforce specifically. We have so decided, and it is familiar law: Foll's Appeal, 10 Norris, 434.

3. It has been asserted, and it is undoubtedly true, that to enforce the complainant's legal rights in this proceeding would inflict serious confusion upon the affairs of the defendant company. It is a well-settled rule in equity that a chancellor will not grant an injunction, even to enforce a legal right, where the injunction will do more mischief than the evil sought to be redressed. This must continue to be the rule so long as his decree is of grace, not of right. Applying this principle to the case in hand, we find that a majority of the stock has already been issued under the arrangement adopted at the stockholder's meeting, and cannot be recalled. Upon each share $20 has been paid in good faith. It requires but a moment's reflection to see that a decree which requires the company to issue the balance of the stock at $10 must necessarily throw the affairs of the company into confusion, and produce the rankest injustice. If this is equity, it is equity misunderstood.

If there were circumstances of oppression in the case there might be more ground for this severe exercise of power. Nothing of the kind appears. On the contrary, the arrangement was entered into in entire good faith; in the belief that it was legal, and under the advice of counsel. Moreover, it was not pretended that all the stockholders were not treated alike. No one stockholder had any advantage over any other. The arrangement was evidently made with a view to the best interests of the company, and in my judgment was wise and conservative. That it was so may fairly be inferred from the fact that the legislature, by the subsequent Act of 29th June,

1881, P. L., 121, expressly authorized the course of proceeding adopted by the company.

I can readily understand why the complainant did not resort to his remedy at law. The measure of damages would in such case have compensated him, but it would have given him no advantage over other stockholders. By filing this bill he gets his stock at $10 per share, for which other shareholders have paid $20, and which is worth in the market $31. Moreover, he has succeeded in throwing the affairs of the company into confusion.

Against such a mode of administering equity I enter my solemn protest.