L. DE LA CUESTA v. INSURANCE CO. OF N. A.

T. E. HUFFINGTON v. INSURANCE CO. OF N. A.

F. H. CUNNINGHAM v. INSURANCE CO. OF N. A.

G. P. CUNNINGHAM, ADMR., v. INSURANCE CO. OF N. A.

CHARLOTTE HULME v. INSURANCE CO. OF N. A.

APPEALS BY PLAINTIFFS FROM THE COURTS OF COMMON PLEAS Nos. 1, 2, OF PHILADELPHIA COUNTY.

WM. DAWSON, EXR., v. INSURANCE CO. OF N. A.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS NO. 2 OF PHILADELPHIA COUNTY.

Argued January 22, 1889.
Re-argued January 13, 1890—Decided October 6, 1890.
[To be reported.]

(a) A stockholder of a corporation being about to make a written protest against the exaction from him of a bonus upon a subscription to a new issue of stock, the company's president requested him not to write it, agreeing that, under his verbal protest, he should have whatever benefit any one should receive, under a written protest, by any suit:

1. The effect of the president's agreement was simply a waiver of a written protest, putting the stockholder in the same position he would have occupied if he had written out his protest in a formal manner; it was not an engagement that the stockholder might recover back the bonus paid by him if any one else should obtain such a recovery.

### Statement of Facts.

2. Money voluntarily paid cannot be recovered back simply because the payment was made under protest. The only effect of a protest is to show the involuntary character of a payment procured by duress, and the intent to claim the money back: Cunningham's App., 108 Pa. 546, explained and distinguished.

3. The coercion which will render a payment under protest involuntary, so that it may be recovered back, must consist of duress either of person or of goods. A mere denial of an incorporeal right, by which a man is placed in a "dilemma" and compelled to choose between conflicting views of the law, is not sufficient for that purpose.

4. A stockholder, who has the right, under the law, to subscribe at par for a proportionate part of a new issue of stock, has an adequate remedy in damages for a refusal by the corporation to recognize that right; and a threat to sell such stock to others, unless he agree to pay more than par for it, will not constitute legal duress: Motz v. Mitchell, 91 Pa. 114, distinguished.

No. 175 July Term 1888, Nos. 77, 109, 110, 111, 112 January Term 1889, Sup. Court.

#### DE LA CUESTA V. INSURANCE CO.

On June 22, 1885, Leandro De la Cuesta brought assumpsit in the Court of Common Pleas No. 1 against the President and Directors of the Insurance Company of North America, to recover back the sum of $7,000, paid by the plaintiff to the defendant company under protest. Issue.

At the trial on April 30, 1888, the plaintiff made an offer embracing his whole case, and proposing to prove, in substance, the following facts:

The defendant company was incorporated by the act of April 14, 1794, L. B. No. 5, 205; and its charter was supplemented by the acts of January 28, 1813, P. L. 43; April 3, 1833, P. L. 118; October 11, 1839, P. L. (1840) 11; April 6, 1842, P. L. 247; May 8, 1850, P. L. 706; and March 14, 1871, P. L. 348. In July, 1876, the stockholders duly accepted the provisions of § 27, act of May 1, 1876, P. L. 60. In 1880, the capital stock being then $2,000,000, of the par value of $10 per share, the board of directors proposed to increase the capital of the company under § 27, act of May 1, 1876, and issued a call for a meeting of the stockholders on November 15, 1880, to consider such proposition. On the day named therefor a meeting of the stockholders was held, at which the following resolution was adopted:

Statement of Facts.

" Resolved ; That the capital stock of this company be increased $1,000,000, by the issue of one hundred thousand shares at par to the stockholders, in proportion of one share for each two shares held by them on the day they shall respectively subscribe for the same,—they subscribing an agreement to pay ten dollars per share for the stock, and also ten dollars per share for the privilege of subscribing, the proceeds of which privilege shall be added to the surplus fund of the company. Subscriptions will be received until, or on, the first day of February, 1881, at which time the right to subscribe shall cease, but no subscription will be received unless two dollars per share is paid at the time of subscribing ; the balance of the subscription, eight dollars per share, will be payable on the first day of August, 1881, and the price of the privilege will be payable, five dollars on the first day of November, 1881, and five dollars on the fifteenth day of December, 1881, with the right to anticipate all payments ; the failure to meet any one of these payments by the last day appointed will be deemed a surrender of the right to subscribe and of the amounts already paid. Certificates will not be issued for these shares until after the fourteenth day of January, 1882.

" At the time of subscribing, scrip receipts will be given, transferable as stock is transferred on the books of the company to purchasers, and these must be surrendered when certificates are issued.

" Interest at the rate of four per cent per annum will be allowed on all payments from the date of receipt, and paid on the next ensuing dividend day, to the registered holder of the scrip receipts, until the certificates are issuable.

" All shares not subscribed for on or before the first day of February, 1881, and those the price of which is not fully paid by the fifteenth day of December, 1881, will then be sold at public auction in this city, on thirty days' notice in the papers, for the benefit of the company, but at not less than twenty dollars per share.

" Out of the proceeds of any shares thus sold, the subscriptions of which have been forfeited, the amounts actually paid by the subscribers will be returned to the holders of the respective scrip receipts, but without interest."

The plaintiff was a stockholder holding 1400 shares. He,

with Winthrop Cunningham & Sons and other stockholders, opposed the exaction of the bonus of $10 per share as a condition of the subscription for the new stock, and with them employed an attorney to prevent that exaction. On January 28, 1881, the plaintiff, with one Keefe, went to the clerk's desk in the office of the company, and the clerk refused to take Mr. De la Cuesta's subscriptions without the bonus, when he took the pen and commenced to write, "This is paid under protest," and had formed part of the word "This;" and then Mr. Platt, the president of the company, standing beside them, said to Mr. De la Cuesta, "Don't write that protest; your verbal one is just as good, and you shall have whatever advantage any party or parties shall receive under a written protest;" and that he, Mr. Platt, would, as president of the company, for the company, guarantee that Mr. De la Cuesta should receive, under his verbal protest, any benefit any one should receive under a written protest by any suit; and in consequence of that Mr. De la Cuesta did not complete his written protest or have his name added as a party to a bill in equity which had been filed by Winthrop Cunningham & Sons and others, on behalf of the complainants and of all other stockholders who might in like right intervene, praying for a decree against the company, to restrain it from carrying out the scheme of issuing said stock subject to the exaction of the bonus of $10 per share, but simply awaited the termination of the proceedings upon said bill. Repeatedly after his verbal protest, and during the progress of the Cunningham suit, Mr. De la Cuesta was requested by the directors of the defendant to withdraw his opposition and demand for his bonus, and unite with the stockholders consenting to the condition of bonus required, but always refused.

In the suit in equity of Cunningham et al. against the insurance company* the court on January 25, 1881, granted an injunction against the company, which, by subsequent order made the same day, was modified "so as to confine it to prohibiting the company dealing with the rights of the plaintiffs, or any of them, or otherwise interfering with those rights, until a further order of the court; and also prohibiting the defendants from taking any action which would deprive the plaintiffs of the right

*See Cunningham's App., 108 Pa. 547.

Statement of Facts.

to subscribe pending this suit either before or after February 1st, under protest, until the further order of this court." A final decree, in said case, was made by the Supreme Court on February 23, 1885, by which it was ordered that the company " allot to the appellants such an amount of the new stock shares as shall be their proportion under the act of the general assembly above recited, free from bonus or charges, and if they, or any of them, have, under protest, paid such bonus or charges for the said stock shares, that the same be refunded to them, with interest." The plaintiff then demanded the return of the bonus paid by him.

The offer of the plaintiff to prove the facts above stated was objected to by the defendant.

By the court: Objection sustained; exception.[1]

—Thereupon the court, ALLISON, P. J., on motion of the defendant, entered a judgment of nonsuit; exception.[2] After argument, a motion to take off the nonsuit was dismissed; exception.[3] The plaintiff then took the appeal to No. 175 July Term 1888, assigning for error:

1. The refusal of the plaintiff's offer.[1]

2. The entry of the judgment of nonsuit.[2]

3. The refusal of the motion to take off the nonsuit.[3]

This appeal was argued on January 22, 1889, before PAXSON, C. J., STERRETT, CLARK, McCOLLUM and MITCHELL, JJ., by *Mr. J. Warren Coulston* and *Mr. George M. Dallas* (with them *Mr. George L. Crawford*), for the appellant, and by *Mr. R. C. McMurtrie* and *Mr. John G. Johnson*, for the appellee.

### DAWSON v. INSURANCE CO.

To No.——December Term 1885, in the Court of Common Pleas No. 2, William Dawson, executor of John Dawson deceased, brought assumpsit against the same defendant upon a similar cause of action. Issue.

At the trial, on May 16, 1888, the plaintiff presented testimony tending to prove that on January 31, 1881, the plaintiff's testator, who was a stockholder in the defendant company, subscribed for 250 shares of the new stock above mentioned, the subscription being made through the plaintiff who was then acting as the attorney in fact of John Dawson; that at the time of making the subscription and paying the first instal-

ment upon it, the attorney in fact and his principal understood that the company had no right to exact the payment of the additional $10 per share, and that if this was paid under protest it could be recovered back; and the representative of the company who received the subscription was informed by William Dawson that the right to exact the extra $10 was disputed and that payment was made under protest, to save the right to the stock, and the words " under protest " were added to the subscription paper.

It was shown further, that on July 26, 1881, John Dawson took advantage of the option to anticipate the maturity of the instalments, and paid the balance of his subscription in full. The record of the Cunningham equity suit was put in evidence.

At the close of the testimony the court, HARE, P. J., charged the jury in part as follows :

The stockholders of the North American Insurance Company, an old and very much respected company in this city, resolved some seven or eight years ago that it would be advisable to increase their capital stock.  Their stock consisted at the time, as I understand, of two hundred thousand shares, rated at ten dollars per share, making the nominal or par value of the shares $2,000,000.  By the resolution the stock was to be increased one half.  That is to say, for every two shares one was to be issued.  Those shares were to be issued as being of the par value of the stock of ten dollars per share; that amount to be paid by the persons who subscribed for it; the effect of which would be to add to the capital stock of the company $1,000,000, with a view, I suppose, to the transaction of a profitable business.  It seems, however, a majority of the stockholders, perhaps the large majority, were of the opinion that a still further increase of the assets of the company was advisable.  They therefore desired that the right to subscribe for an additional one hundred thousand shares at ten dollars per share should be on condition that, in exercising it, whoever subscribed ten dollars for one of the new shares of the stock should also pay ten dollars for the privilege of being admitted to the new subscription.

The first condition, under the ruling of the Supreme Court,

Charge of Court below.

they were entitled to make, and the second condition was illegal. . . . .

Under these circumstances, the new stock was issued and scrip was to be given for it, and any man who came forward and paid, as the payments fell due, at the rate of ten dollars for each share, and who after having made those payments continued to pay ten dollars for the privilege of buying a share and becoming a stockholder, would become entitled to his proportion of these new shares of stock. If, however, he did not comply with all these conditions, including the condition which required him to pay ten dollars for the privilege, he would forfeit his right to the new stock, and, moreover, that stock would be sold to the highest bidder and acquired by third persons, which would introduce a new element into the company.

This course reduced the plaintiff to a dilemma. If he did not comply with the illegal condition, the stock would be sold and new holders brought into the company. How much disadvantage that would cause I do not know. In some instances it might be very considerable. On the other hand, if he paid without protest he certainly could not get the money back, and it would be so much lost to him except that, going into the treasury of the company, he would be entitled to participate in it as a stockholder. Under these circumstances, the plaintiff paid the ten dollars which were necessary to buy the stock and the ten dollars which were necessary to entitle him to the privilege of buying, declaring that he did it under protest. These words are used customarily to convey the idea that the party is giving something that he does not owe, to some one who is not entitled to receive it, and that he does so against his will and under coercion. Such was the course that the plaintiff desired to pursue, but it is questionable whether he took the proper means to carry his purpose into effect.

When the last day for subscription was about to expire he signed the paper with the words "under protest" and paid two dollars per share for two hundred and fifty shares of stock and took a scrip receipt, subjoining "under protest." Had this been all, it would not have been a clear intimation of his purpose. I do not assert that it would not have been sufficient,

*Charge of Court below.*

because the company might have gathered what he intended, but I cannot say that without more it would have been an explicit explanation.     But his son, Mr. William Dawson, who represented him at the time and now acts as his executor, declares that he stated, in paying the first instalment, "I said we paid under protest and did not think they had no right to demand the ten dollars bonus; we were obliged to pay these instalments because we could not otherwise get our stock."     This occurred on January 31, 1881, and the payment of two dollars per share on the price of the stock took place on the same day, and the remaining instalments were to be paid successively; but on July 26th, the plaintiff paid the whole amount in advance, with a view, no doubt, to a discount of four per cent on what was not yet due.     That is, he paid the entire price of the stock which was not all yet due, and also all that he was to pay for the privilege of becoming a purchaser, none of which had become due; and he did so without saying anything or making any protest, simply handing the money over to the company as in full.

The question for the jury is whether what passed on January 31st, was so much a part of the whole transaction that the protest then made was a protest against the subsequent payments, and whether the company understood or ought to have understood from what the plaintiff then said that whatever he might do in the same matter would be against his will, reserving the right to recover back whatever they had no legal right to demand. . . . .

The defendant's counsel ask me to charge you:

5. There can be no recovery in this form of action.

Answer: I decline that point.[1]

6. The plaintiff's right, if he have any, after permitting his fellow-stockholders to frame and partially execute the scheme they did, is to an action for damages for not issuing stock to him at par.

Answer: I decline that point.[2]

7. He cannot, by resorting to this form of action, retain the benefit resulting from the compliance with the terms by his fellow-stockholders and reclaim the portion he contributed.

Answer: I decline that point.[3]

8. The plaintiff's right depends on there having been a protest by him at the time of the payment.

Statement of Facts.

Answer: I affirm that point with this qualification: At the time of payment, or at such a time in the course of the same transaction as would operate as a protest at the time of payment, subject to what I have said with regard to that already.[4]

9. If he did not protest at the time of payment, it is immaterial that he protested when he signed the contract or made the first payment on the ten dollars which was legally demanded.

Answer: I decline that point.[5]

10. The verdict on the evidence should be for the defendant.

Answer: I decline that point.[6]

—The jury returned a verdict for the plaintiff for $2,500. A rule for a new trial having been discharged, judgment was entered upon the verdict; thereupon, the defendant took the appeal to No. 77 January Term 1889, assigning for error:

1–6. The answers to the defendant's points.[1 to 6]

This appeal was argued January 30, 1889, before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ., by *Mr. R. C. McMurtrie* and *Mr. John G. Johnson,* for the appellant, and by *Mr. George Tucker Bispham* (with him *Mr. William Henry Lex*), for the appellee.

HUFFINGTON (AND OTHERS) v. INSURANCE CO.

To June Term 1885, in the Court of Common Pleas No. 2, four actions against the same defendant were brought by Winthrop Cunningham & Sons, Fanny H. Cunningham, G. P. Cunningham, administrator of Winthrop Cunningham, deceased, and Charlotte Hulme, respectively. Before trial, the first of these suits was marked for the use of Thomas E. Huffington, assignee for the benefit of creditors of the plaintiff firm. These four cases raised substantially the same question as the De la Cuesta and Dawson cases. An additional question was raised by the action of Winthrop Cunningham & Sons, which was brought to recover back the bonus paid by the plaintiff upon certain shares not embraced in the equity suit reported in 108 Pa. 557. Certain shares of the old stock held by Cunningham & Sons had been transferred by them to other parties as collateral security for advances of money, and were standing in the names of the transferees at the time the subscriptions for new stock were taken by the company. The

Arguments.

subscriptions which the owners of the pledged stock were entitled to make, were made in the names of the persons who were holding it as collateral security, but the subscriptions were paid with the money of Winthrop Cunningham & Sons.

The court, MITCHELL, J., refused to permit the plaintiff to show that the firm of Cunningham & Sons were the real owners of the old stock and the real subscribers to the new stock involved in this action, and at the close of the testimony for the plaintiff in each of these four cases, entered judgment of nonsuit. Rules to show cause why the nonsuits granted should not be taken off were afterwards discharged, whereupon the plaintiffs took the respective appeals at Nos. 109, 110, 111, 112 January Term 1889, filing specifications of error complaining of those rulings.

These appeals were argued together on March 28, 1889, before PAXSON, C. J., STERRETT, CLARK, McCOLLUM and MITCHELL, JJ., by *Mr. William Henry Lex* and *Mr. George Tucker Bispham*, for the appellants, and by *Mr. R. C. McMurtrie* and *Mr. John G. Johnson*, for the appellee.

On May 6, 1889, the Supreme Court ordered a re-argument in No. 175 July Term 1888, De la Cuesta v. Insurance Co., and on January 13, 1890, it was again argued before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

*Mr. George Tucker Bispham* and *Mr. George M. Dallas*, for the appellant:

The question for this court is whether the testimony offered would, if admitted, have supported a verdict for the plaintiff. It would have established all the averments, not peculiar to the plaintiffs in that bill, upon which the decree of this court in Cunningham's App., 108 Pa. 557, was rested, and the decision in that case conclusively supports the general position upon which the present action is based. It determined, not only that the stockholders were entitled to a pro rata allotment of the new stock clear of bonus, but also that any of the plaintiffs in that suit who had paid the bonus under protest, were entitled to have it refunded with interest. Our claim for a return of the bonus paid by us under protest, is resisted upon the

ground that the payment was voluntary.    To this defence we reply :

1. The payment of bonus by the plaintiff was of such a nature and made in such circumstances as to entitle him to a return thereof, independent of the matters we shall refer to subsequently.    This point is ruled by Cunningham's Appeal, supra.    There is nothing in the report of that case indicating that the decree was based upon circumstances peculiar to it and not existing in the present case.    Nor did the modified injunction in that case give to the protest of the plaintiffs therein any peculiar potency or effectiveness, or bring the case under the doctrine of Shaw v. Allegheny, 115 Pa. 46, which differed from it essentially.    The decision in Cunningham's Appeal, respecting the right to a return of the bonus, was not based upon any equity peculiar to the plaintiffs in that particular case, but upon a common-law right, pertaining alike to all who had paid under protest.    The conclusion there reached is in harmony with the other Pennsylvania authorities : Motz v. Mitchell, 91 Pa. 117.    Union Ins. Co. v. Allegheny, 101 Pa. 251, and Peebles v. Pittsburgh, 101 Pa. 304, which, as the opinion in Shaw v. Allegheny, 115 Pa. 46, shows, went to the extreme verge, are distinguishable on the ground that they related to levies upon lands.

2. The general doctrine as to payments not voluntarily made, is illustrated by the following cases : Parker v. Railway Co., 6 Exch. 702 (49 E. C. L. 253) ; Sutton v. Railroad Co., 4 Eng. & I. App. 249 ; Parker v. Railroad Co., 7 M. & G. 292 ; Wakefield v. Newbon, 6 Q. B. 275 ; Ashmole v. Wainwright, 2 Q. B. 827 ; Hospital v. Philadelphia Co., 24 Pa. 229 ; Cobb v. Charter, 32 Conn. 365 (87 Am. Dec. 178) ; Baker v. City, 11 Ohio 534 ; Lehigh C. & Nav. Co. v. Brown, 100 Pa. 358 ; White v. Heylman, 34 Pa. 142 ; Lawrence v. Philadelphia, 14 W. N. 421 ; Amer. Steamship Co. v. Young, 89 Pa. 187 ; McCrickart v. Pittsburgh, 88 Pa. 133.    However, neither Cunningham's Appeal nor the present case depends upon the doctrine of duress ; they are entirely outside of that doctrine.    We are stockholders dealing with our agents, the managers of our company. The company stands toward us in a fiduciary relation.    How can the defence that the money was voluntarily paid, possibly avail a trustee, as against his cestui que trust, in a chancery

proceeding? And this action for money had and received is, in substance, a bill in equity. The effect given to the protest in Cunningham's Appeal was not referable to compulsion, but was expressly put upon the ground of non-acquiescence in the scheme under which the payments were demanded.

3. Not only was the payment of the bonus by the plaintiff made under protest, but the protest as made was accepted as a sufficient reservation of his rights, and as securing to him a return of the money if the demand for it was unwarranted. Having, through its president, given the plaintiff reason to rely upon his protest as effectual, and having claimed the benefit of the president's act in receiving the money paid on the strength of this reliance, the defendant is estopped from disputing the plaintiff's right to have his money returned: 2 Herman on Estoppel, §§ 733, 735; Ackla v. Ackla, 6 Pa. 228; Mercer M. & M. Co. v. McKee, 77 Pa. 170; Bidwell v. Pittsburgh, 85 Pa. 418; Montgomery v. Heilman, 96 Pa. 44; Spring St:, 112 Pa. 258; Jones v. Building Ass'n, 94 Pa. 215. Again; the express agreement, under which the plaintiff paid the bonus, was that if he would abstain from making a written protest, he should be accorded any benefit which any other stockholder might obtain by suit. Hence, as the plaintiffs in the Cunningham suit thereby obtained a return of the bonus paid by them, this plaintiff is entitled to a similar benefit. His right to subscribe for shares was not based upon contract, but upon a statute, and his repudiation of a condition, wrongfully attempted to be coupled with the exercise of the statutory power, gave him the right to receive the shares at par.

*Mr. R. C. McMurtrie* and *Mr. John G. Johnson*, for the appellee:

1. We do not dispute, upon this record, that the president made the uncompleted protest perfect for the purpose of the case. He doubtless had power to waive a written protest and agree that a verbal one should be its equivalent; but he had no inherent power to do more than that, and his words cannot be tortured into anything more than an agreement that De la Cuesta should receive, under his verbal protest, the same benefit which any one else might recover by virtue of a written protest. The Cunninghams did not recover on their bill by virtue of their

Arguments.

protest; their recovery depended upon facts and rights existing at the date of filing their bill, and the protest by them after bill filed, neither enlarged nor diminished their rights. Cunningham's Appeal does not decide the right of the plaintiff to recover in this case. In making the final decree therein, the effect of the conduct of the parties pendente lite was in the mind of the court, and the decree was necessarily confined to the rights of the litigants. Moreover, it seems to have escaped attention that no question as to paying under protest arose in that case.

2. The real question, here, is whether a payment made under protest can be recovered back, and the only point raised by the case is this: Was the remedy which the plaintiff elected to pursue the proper one? The plaintiff's right, under the company's charter, to have certain shares alloted to him at par, differed in no respect from a right to have so many shares delivered to him under a contract to sell. He had two remedies open to him. One would be to buy shares in the market, after a refusal of the company to deliver him shares at par, and then sue for what he would have to pay in the market beyond the par value. The other would be to tender par, and sue for the refusal to deliver the shares. The remedies exclude all others in the case of a claim to stock that can be purchased on the market: Fry on Spec. Performance, 11; Angell & Ames on Corp., § 381. The exceptional remedy of paying under protest and then suing to recover back the money paid, is allowed only when the payment has been coerced by duress. Injustice, even though it amount to actual fraud, does not warrant it: Moses v. Macferlan, 2 Burr. 1009.

3. Even when payment has been coerced by duress of goods, the exceptional remedy is excluded whenever there is a form of action that enables the owner to get back his goods without actual payment: Gulliver v. Cozzins, 1 C. B. 799. To render a payment involuntary, there must be an actual, present, and potential compulsion: Harvey v. Girard N. Bank, 119 Pa. 212; Harrison v. Waln, 9 S. & R. 319; Union Ins. Co. v. Allegheny, 101 Pa. 250; Peebles v. Pittsburgh, 101 Pa. 304; Lehman v. Shackleford, 50 Ala. 437; Harman v. Hannon, 61 Me. 227; Swanston v. Iiams, 63 Ill. 165; Elston v. Chicago, 40 Ill. 514 (89 Am. Dec. 361); Mayor v. Gill, 4 Gill 425; Awalt v. Eutaw,

Opinions of the Court.

34 Md. 435; Ocean Steamship Co. v. Tappan, 16 Blatch. 296; Detroit v. Martin, 34 Mich. 170 (22 Am. Rep. 512); Sheldon v. Sch. Dist., 24 Conn. 88; Lamborn v. Dickinson Co., 7 Otto 181; Lackey v. Mercer Co., 9 Pa. 318. But the refusal to recognize a right, such as the plaintiff here had, is not duress within the meaning of the law: Silliman v. United States, 101 U. S. 465; Davis v. Bank, 2 Bing. 393. A protest is of no force except to make apparent that the payment is not voluntary, and that the duress by which it is compelled is not waived: Marriott v. Hampton, 2 Sm. L. C. 456. That a contract executed six months before the payment, would constitute duress is absurd: Wilson v. Ray, 10 Ad. & E. 82.

4. The plaintiff's right to demand that shares be issued to him at par, is not decided in Cunningham's Appeal. By the bill, in that case, Cunningham put the company to an election either to abandon its scheme, or, if it went on, to issue shares to him at par. De la Cuesta did not put the company to such an election. He entered into a contract for shares, and he could obtain them only on the terms of that contract. Even in cases of fraud, the purchaser of property cannot get it for less than he agreed to pay: Great Luxemburg v. Magney, 25 Beav. 586; Evans v. Borie, 1 W. N. 127; Adywell Mining Co. v. Brookes, 35 Ch. Div. 400; Driscoll v. Bromley, 1 Jur. 238. There was no other pressure that induced the plaintiff to make the payment than the dilemma which arose from uncertainty as to the law of the case. A prospect or a threat of a lawsuit does not render a payment involuntary: Hospital v. Philadelphia Co., 24 Pa. 229. There was no threat to sell the plaintiff's right to any shares if he did not pay, and the company could not have done so. If he had a right to receive shares on payment of ten dollars, nothing that the company could do would divest that right.

### DE LA CUESTA v. INSURANCE CO.

OPINION, Mr. CHIEF JUSTICE PAXSON:

I do not understand that there is any dispute as to what took place at the office of the defendant company on January 28, 1881, when the plaintiff called there to pay the subscription to the new stock. The following account of what then occurred is taken from the plaintiff's offer of proof:

"That Mr. De la Cuesta, January 28, 1881, went with Mr. Keefe to the clerk's desk in the office of the company, and the clerk refused to take Mr. De la Cuesta's subscription without the bonus, when he took the pen and commenced to write, 'this is paid under protest,' and had formed part of the word 'this,' and then Mr. Platt, the president of the company, standing beside them, said to Mr. De la Cuesta: 'Don't write that protest; your verbal one is just as good, and you shall have whatever advantage any party or parties shall receive under a written protest;' and that he, Mr. Platt, would, as president of the company, for the company, guarantee that Mr. De la Cuesta should receive, under his verbal protest, any benefit any one should receive under a written protest by any suit; and in consequence of that Mr. De la Cuesta did not complete his written protest, or have his name added to Cunningham's bill, but waited the termination of those proceedings and then demanded the return of his bonus."

The effect of these facts, thus stated by the plaintiff himself, is to place him in the precise position he would have occupied had no conversation occurred between Mr. Platt and himself, and he had gone on and completed his written protest. The defendant company does not deny the facts as stated by plaintiff, nor seek to avoid the legal effect thereof. There was nothing in the transaction but a waiver of protest; that is to say, the protest was to be as effectual as if it had been written out in the most formal manner. It furnishes no evidence of a contract between the plaintiff and the corporation that, as a consideration for the plaintiff not putting his protest in writing, he should be entitled to recover, if any one, in any suit, past, present, or to come, should be capable of recovering. On the contrary, he was to have the advantage only of what any other person should receive in any suit by virtue of a written protest. There was no consideration for anything else. The company did not receive the bonus because of the waiver. The plaintiff went to the office for the purpose of paying the money, and would have paid it under a written protest had not Mr. Platt, as an act of courtesy, merely, accepted the verbal waiver. In this connection, I am unable to see what Cunningham's App., 108 Pa. 546, has to do with the case. There was no question of the effect of a protest in that case; it was

not alleged that the decree was obtained on any such ground. The bill was filed to restrain the scheme proposed by the company, or to limit the new stock to ten dollars per share, its par value; to compel the company to issue the stock to complainants upon the payment of ten dollars per share, and to restrain it from selling the allotments to which the plaintiffs were entitled. This left the company an option. They could advance or recede. As they had gone on to a large extent, upon terms offered and accepted by nearly all the stockholders, this bill did not interfere with the scheme further than was necessary to sustain the right of the particular claimants therein to have their shares of the new stock issued to them at par, if the company concluded to issue the shares. The present plaintiff gives the company no option, but is seeking the same advantage as though he had put the company to an election ; that is to say, by protesting under the contract, or against being required to contract, he can obtain the right under the contract without being bound to comply with its terms.

Undue importance has been attached to the following language in the decree in Cunningham's Appeal : "And if they or any of them have, under protest, paid such bonus or charges for the said stock shares, that the same be refunded to them, with interest." This must be understood to apply only to the litigants in that case. This court did not intend to decide the rights of parties not before it, who were not and could not have been heard. It has never, since its foundation, attempted to exercise such an arbitrary power. Moreover, there was neither protest nor payment in that case; there was nothing, therefore, to which the language referred to could apply, and the expression was doubtless used inadvertently. The decree is broader than the case.

The only important question presented by this record is the legal effect of payment under protest. The plaintiff was entitled, under Cunningham's Appeal, supra, to subscribe for the new stock at par. The company required him to agree to pay an additional sum at a future time for the privilege of subscribing. This bonus, as it was called, was to be added to the surplus fund. This, however, is not material. He signed the contract to pay the additional sum, under protest, and paid under protest. This suit was brought to recover back the money thus demanded. This is the whole case.

It will be observed there was nothing to interfere with the plaintiff's right to stock which he already held. It was a contract for the delivery, not of his proportion of the new stock, but of the certificates or evidence of his ownership of such stock. The stock was already his, and no action of the company could deprive him of it. He could have tendered the par of the stock and demanded a certificate. If the company had refused to issue it, he could have brought suit and recovered its market value. If he wanted the shares, he could have bought them in the market and recovered from the company what he paid in excess of par. One share of the stock of a business or trading corporation is the precise equivalent of every other share; hence it is that equity does not concern itself about particular shares, and a bill will not lie to compel specific performance for the sale of specific shares: Foll's App., 91 Pa. 434.

There is no principle of law better settled than that money voluntarily paid with a knowledge of the facts cannot be recovered back. It is unnecessary, in referring to a settled rule of law, always to state the reasons of the rule in a judicial opinion. It is sufficient to say here that I know of no legal principle which is sustained by better reasons of public policy. If, in every instance, in which a man is in doubt as to which is the safe course to pursue, he can pay under protest, and then sue to recover it back, it is difficult to see where litigation is to end. The law, therefore, wisely holds that a voluntary payment cannot be recovered back. In the recent case of Harvey v. Girard N. Bank, 119 Pa. 212, the law is thus stated: "A voluntary payment of money under a claim of right cannot in general be recovered back. There must be compulsion, actual, present, and potential, in inducing the payment by force of process available for instant seizure of person or property, when the party so paying must give notice of the illegality of the demand, and of his involuntary payment. The element of coercion being essential, a mere protest or notice will not change the character of the payment, or confer of itself a right of recovery;" citing Peebles v. Pittsburgh, 101 Pa. 304. In Harvey v. the Bank there was a loss of credit, a very serious matter to a business man, by permitting a draft to go to protest. The party paid to protect his commercial honor, but we said it was not duress. In Neely's App., 124 Pa. 406, there was an attempt to set aside an ante-

nuptial contract on the ground of duress.    After the marriage day had been fixed, the guests invited, and the caterer engaged, the husband produced an ante-nuptial contract which he required his intended wife to sign.    She protested by her tears; his reply was, "No contract, no wedding."    We held there was no duress.    Many other cases of a like nature could be cited were it necessary.    Those above mentioned are referred to as showing that mere embarrassment, or loss of credit, as in the bank case, or mortification, as in the Neely case, do not amount to the kind of duress which the law recognizes as justifying a payment under protest.    And just here it is proper to remark that the only effect of a protest, in a case in which it may be legitimately applied, is to show that the payment was not voluntarily made, and that the party protesting intends to claim it back.

The law in regard to voluntary payments was well and concisely stated by Chief Justice LEWIS in Hospital v. Philadelphia Co., 24 Pa. 229: " A voluntary payment of money under a claim of right cannot, in general, be recovered back; but it has been held that when a party is compelled by duress of his person or goods to pay money for which he is not liable, it is not voluntary, but compulsory; and he may rescue himself from such duress by payment of the money, and afterwards, on proof of the fact, recover it back: Astley v. Reynolds, 2 Str. 916; 12 Pick. 13.    But the threat of a distress for rent is not such duress, because the party may replevy the goods distrained, and try the question of liability at law: Knibbs v. Hall, 1 Esp. Rep. 84.    The threat of legal process is not such duress, for the party may plead and make proof, and show that he is not liable. Brown v. McKinally, 1 Esp. Rep. 279.    But the warrant to a collector under a statute for the collection of taxes, is in the nature of an execution running against the person and property of the party, upon which he has no day in court, no opportunity to plead and offer proof and have a judicial decision of the question of his liability.    Where, therefore, a party not liable to taxation is called on peremptorily to pay upon such a warrant, and he can save himself and his property in no other way than by paying the illegal demand, he may give notice that he so pays it by duress, and not voluntarily, and maintain an action to recover it back;" citing 17 Mass. 461; 12 Pick. 13.    We

have here, succinctly stated, the principle upon which the doctrine rests in its application to a warrant for the collection of taxes. If the demand is illegal, and the party can save himself and his property in no other way, he may pay under protest and recover it back. But if other means are open to him by which he may prevent the sale of his property; if a day in court is accorded to him, he must resort to such means. Thus, the seizure of a man's goods under a landlord's warrant for rent that is not due, or for more than is due, would seem to be duress as much as the seizure of property for taxes; yet, if the unlawful demand for rent be paid under protest, it cannot be recovered back for the reason above stated, that the tenant can replevy the goods, and try the issue of no rent in arrear before a jury.

In Taylor v. Board of Health, 31 Pa. 73, it was held that a payment of taxes imposed by an act of assembly which was afterwards held to be unconstitutional, was not compulsory because made under a threat, express or implied, that the legal remedies to collect it would be resorted to. In McCrickart v. Pittsburgh, 88 Pa. 133, it was ruled that where a party would recover back taxes he is under no legal obligation to pay, he must protest, or give notice of his intention to reclaim them. Motz v. Mitchell, 91 Pa. 114, much relied upon by the plaintiff, was the case of an unrecorded deed for certain real estate which the party having obtained the possession of, used for extorting money from the owner of the premises. The destruction of the deed, in such case, might be the loss of title, and a suit brought to recover it might not avail as it would not necessarily prevent its destruction. This case came fairly within the doctrine of White v. Heylman, 34 Pa. 142, where a promissory note was given by a principal to his fraudulent agent to secure certain rights to which he was entitled, and out of which he had been defrauded by the agent, and it was held that in a suit by the equitable transferee of the note, the equities between the original parties could have been inquired into. Union Ins. Co. v. Allegheny, 101 Pa. 250, was the case of the payment of executions issued to sell lands for taxes, where the lien of the taxes had previously been discharged by a sheriff's sale; held, that the payment was voluntary. Two reasons were given. One was that the execution could not take from

the company the possession of the land, and the other was that there might have been an application to a court of equity before the sale.   It was said by Mr. Justice MERCUR: " No immediate and urgent necessity existed for the payment of the taxes to protect the property of the plaintiffs.   Its goods were not about to be seized."   In Peebles v. Pittsburgh, there was a street assessment against plaintiffs' real estate, under an act of assembly which this court subsequently held to be unconstitutional.   The plaintiff paid his assessment under protest after notice that a scire facias would be issued to collect it; held, (*a*) that his payments, having been voluntary, could not be recovered back, and (*b*) that his notice and protest at the time of his payments gave him no higher right.

In Shaw v. Allegheny, 115 Pa. 46, it was held that a tax-payer who has invoked the aid of a court of equity in vain to restrain the collection of a tax by a sheriff's sale of the real estate taxed, the lien of which has been divested by a prior sheriff's sale, does not become a volunteer in the payment of said tax.   It was said by Mr. Justice STERRETT, in delivering the opinion of the court: " Plaintiff's property having been levied on and advertised by the sheriff, he appealed to the equity side of the court for relief, but it was denied, and he was thus compelled either to submit to a sale of his property, by which his title thereto might be imperiled, or pay the taxes and costs.   On the eve of the sale, he chose the latter alternative, and paid the city's unjust demand under protest.   In a legal sense was this a voluntary payment?   We think not.   In Union Ins. Co. v. Allegheny, 101 Pa. 250, it was said of the insurance company, which was similarly circumstanced, except that it did not apply to the court for redress, that ' by application to the equitable powers of the court, or by bill in equity, execution might have been stayed, and the claim removed from the record.'   That is just what plaintiff in this case endeavored to do, but without success; and therein is the distinction between that case and this.   Relief in the form suggested in that case was asked, but it was refused, as we think erroneously; and plaintiff was compelled to choose one of the two alternatives above mentioned.   If there is anything against which equity should relieve, it is an act of injustice and oppression, such as the city was proceeding to commit by exposing plaintiff's property to

sale on liens which had been previously divested by sheriff's sale."

It would exceed the reasonable limits of a judicial opinion, and serve no useful purpose, were I to attempt to review the vast mass of authorities cited upon either side. Nor is it necessary to go outside of our own state for authority. We have abundant cases of our own which rule the question.

Applying the law as we find it to the facts of this case we are of opinion there was no duress. It is a duress either of person or goods that constitutes the coercion. It is not pretended there was a duress of person, nor was there anything to show duress of goods. There was nothing but the denial of a right, and a declared intention not to recognize a right is not duress. It is true, the denial of the right placed the plaintiff in a "dilemma," to use the expression of Judge Hare in Dawson's case. But if we adopt the principle that whenever a man is placed in a position in which the law is doubtful, and he is compelled to choose between two paths, in other words, to decide between conflicting views of the law, he is to be considered as under duress, we shall certainly multiply litigation, even if no other end is accomplished.

It is fair to test this question by supposing the company to have done what it is alleged they threatened to do. Suppose the plaintiff had tendered the company the par of the new shares to which he claims he was entitled; that the company had declined to accept it, and had sold the right to subscribe for a corresponding number of shares. How would this have affected the rights of the plaintiff? The company could no more have sold his stock than they could have sold his house. If he had a right to certain shares by paying ten dollars each therefor, that right could not have been divested by a sale of them by the company, nor by any other action on its part. His rights as a stockholder were fixed by the law: a certificate would have added nothing to them; it would have been evidence, nothing more, that he owned stock, but that already appeared upon the books of the company. The duress, if any, was not of a thing, of goods or chattels, but of an incorporeal right. Had the stock been sold he would have had no contest with the purchaser, as he would have necessarily had if a corporeal thing, or the title to a corporeal thing, had been sold

accompanied by delivery of possession. He had to do only with the company ; and, after tender of the par, could have brought his suit and recovered, as before stated, the market value of the stock, and if he wanted shares, with the money thus recovered could have bought a corresponding amount of other shares.

It was urged, however, that this case is upon all fours with Motz v. Mitchell, *supra*, where there was duress of an unrecorded deed, while in the case in hand there was duress of stock. This argument involves the assumption that a certificate had been issued for the new shares, which certificate the company unlawfully withheld from the plaintiff. In point of fact, the plaintiff never had a certificate for the new shares, for none had been issued. The plaintiff had a right to demand a certificate for them upon payment of the par, and to sue them for a refusal, as before stated. That there could not be duress of this right is too plain for argument. There was not duress of person or goods : there was simply the denial of a right; a refusal to issue shares of stock to which the plaintiff was entitled, and for which refusal he had a full, complete, and convenient remedy at law. We may concede that the action of the company placed him in a " dilemma ; " he had to choose between two roads, neither of which he may have regarded as safe. In other words, he was uncertain as to his legal rights under the scheme proposed by the company. The " dilemma " was the uncertainty of the law. There was no other pressure or duress that caused the payment. However great the uncertainty of the law may be in particular cases, it has never been supposed to amount to duress of either person or goods. It was nothing more than is experienced by every lawyer in the course of his practice. He is often called upon to advise, where the law is uncertain ; and, in all such cases, the client must take the risk.

We attach little importance to the suggestion that the company was acting in a fiduciary capacity. This was a matter really between the stockholders, and they were evidently dealing at arms' length. The corporate organization was the means by which their scheme was carried through.

Fortunately, the plaintiff suffers no injury by the affirmance of this judgment. He receives his proportion of the new shares at the same price at which they were issued to the other

stockholders.   It is true he does not get shares at ten dollars for which others paid twenty, but his equity in this respect is not strong.

We find no error in this record.

Judgment affirmed.

Mr. Justice STERRETT and Mr. Justice CLARK dissented.

### DAWSON v. INSURANCE CO.

OPINION, MR. CHIEF JUSTICE PAXSON:

This case is ruled by De la Cuesta v. Insurance Company of North America.   It is unnecessary to add anything to what was said in that case.

Judgment reversed.

### HUFFINGTON v. INSURANCE CO.

OPINION, MR. CHIEF JUSTICE PAXSON:

This case is ruled by De la Cuesta v. Insurance Company of North America, just decided.   The first three assignments of error present a question which was not involved in that case; but in the view we take of it they are unimportant, and do not require comment.

Judgment affirmed.

### CUNNINGHAMS AND HULME v. INSURANCE CO.

OPINION, MR. CHIEF JUSTICE PAXSON:

These cases are ruled by De la Cuesta v. Insurance Company of North America, just decided.   In each of them the

Judgment is affirmed.